**In the Matter of Irma T. BYRNE, Anna M. Maslovara and Kathleen Carothers, Appellants,**

**v.**

**Jane SCHNEIDER, Respondent.**

**No. 58316.**

Missouri Court of Appeals,
Eastern District,
Division Two.

May 7, 1991.

P. Dennis Barks, Hermann, for appellants.

Walter D. McQuie, Jr., Montgomery City, for respondent.

GARY M. GAERTNER, Presiding Judge.

Appellants, the sister and niece of the ward, Irma Byrne, appeal an order of the Circuit Court of Gasconade County appointing respondent, Jane Schneider, the guardian of the ward. We affirm.

The ward is an 80 year old woman suffering from progressive organic brain disease with senile dementia. The evidence reveals that the ward first exhibited signs of the disease in late 1987, when she was swindled by "repairmen" who allegedly performed work on her driveway and roof. The swindlers requested that ward pay them in excess of $13,000.00 for the "work" and were given a check by the ward. The amount of the check aroused the suspicion of the ward's bank, who contacted the respondent and asked that she bring in the ward so that they could discuss the payment of the check.[1] The ward stopped payment on the check, but later executed another check in the same amount. Again, payment was stopped. Finally, the ward executed a cashier's check from a different bank. This latter check cleared. The evidence further infers that another check, for $3,000.00, had been sent out earlier that month.

Due to her victimization by the "repairmen" and her feeling unsteady in conducting her financial affairs, the ward contacted Donald Althauser, a local attorney, about giving respondent the ward's power of attorney. A durable power of attorney was executed and notarized on December 10, 1987. After consulting with her broker, James Hardesty, the ward modified the original durable power of attorney by deleting one section and adding the following:

To Whom It May Concern: In the event that it is necessary for the court to appoint a guardian for me, I agree to designate and appoint as my guardian, Jane Schneider, as she has been handling all of my affairs being the power of attorney for me. This takes the place of another letter of authority previously written.[2]

The modification of the durable power of attorney was signed and dated January 5, 1988. Donald Althauser and respondent both testified regarding the execution of the modification, however, the modification was never notarized.

After respondent took over the financial affairs of the ward, she consulted with Mr. Hardesty. Respondent testified that Mr. Hardesty advised her on filling out a ledger to keep track of how the ward's money was spent and also told her that any work done by her or others for the ward should be paid for. The respondent also consulted with Joy Haeffner, a financial planner, who invested $40,000.00 of the ward's funds into a single premium life insurance policy.

The progression of the disease on the mind of the ward was swift. Several witnesses testified that the ward began to have difficulty caring for herself; on one occasion turning the hot water in the shower on and forgetting how to turn it off. Due to the progression of the disease, respondent, her daughter or her daughter-in-law stayed twenty-four hours a day with the ward for some time. The respondent testified that Mr. Hardesty suggested that $50.00 per day would be fair pay for this service.

Around July 4, 1989, the ward fell and injured herself. After a two day hospital stay, the ward was transferred to Frene Valley Health Center, a nursing home. Respondent consulted with doctors and nurses at the facility, and determined that the ward would not be able to come back to her own home. Respondent testified that the income from the ward's investments was insufficient to pay for the ward's care and, after consulting an attorney, she decided to sell the ward's home and belongings. Respondent testified that, after the sale, the interest from the ward's holdings alone would be sufficient to pay for the ward's

1. The ward did not drive an automobile and the respondent often drove the ward into Hermann to shop, see her physician or go to the bank.

2. The section replaced stated that the court could terminate the power of attorney if the ward was deemed incompetent.

care. Respondent submitted an accounting to the court estimating the total value of the ward's estate at over $240,000.00.

On September 26, 1989, appellant, Anna Maslovara, the sister of the ward, filed a "petition for appointment of guardian or conservator" in the Circuit Court of Gasconade County nominating the ward's niece, Kathleen Carothers, as guardian. The respondent filed her petition for appointment on October 26, 1989. John O'Conner, a Gasconade County attorney, was appointed to represent the interests of the ward at the hearing.

The hearing on the petitions was held on January 8, 1990, and was continued on January 22, 1990. On March 16, 1990, the trial court, finding itself bound by "no statutory presumptions as to preference or priority" found that "all other considerations being relatively equal, the preference and intent of the respondent as expressed by her in words, writings, actions, and conduct, when competent to do so ... clearly indicated that she would have Jane Schneider serve as guardian and conservator." This appeal followed.

■ Appellants' first claim, basically, is that the trial court erred in failing to apply any statutory presumption in this case. We agree that a presumption should have been applied in this case, however, the presumption that should have been applied does not favor appellant.

RSMo § 475.050 (1989) states in relevant part:

**475.050. Who may be appointed guardian or conservator of disabled or incapacitated persons**

1. Before appointing any other person ... as guardian of an incapacitated person ... the court shall consider the suitability of appointing any of the following persons who appear to be willing to serve;

(1) If the incapacitated or disabled person is, at the time of the hearing, able to make and communicate a reasonable choice, any eligible person ... nominated by him;

(2) Any eligible person ... nominated in a durable power of attorney executed by the incapacitated or disabled person, or in an instrument in writing signed by the incapacitated or disabled person and by two witnesses who signed at his request, before the inception of his incapacity or disability, at a time within five years before the hearing when he was able to make and communicate a reasonable choice;

(3) The spouse, parents, adult children, adult brothers and sisters and other close adult relatives of the incapacitated or disabled person and any eligible person ... nominated in a duly probated will of such a spouse or relative executed within five years before the hearing.

2. Except for good cause shown, the court shall make its appointment in accordance with the incapacitated or disabled person's most recent valid nomination of a person qualified to serve as guardian of the person or conservator of the estate. In the event there is not brought to the attention of the court any such valid nomination executed within five years before the hearing, then the court shall give consideration to the most recent valid nomination brought to its attention, but the court shall not be required to follow such nomination.

Appellant argues that appellant Carothers, as niece of the ward, qualifies as a "close relative" under RSMo § 475.050.1(3). Whether a relative qualifies as a "close relative" under Missouri law is, certainly, something best left to the finder of fact, reviewable under the standards set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We need not review the trial court's finding as to appellant Carothers, however, as we find the preference under RSMo § 475.050.1(2) applicable and hold that this preference has priority over that stated in RSMo § 475.050.1(3).

Prior to the 1983 revisions of the guardianship code, Missouri statutory law did not provide preferences in the appointment of guardians for incompetent persons.[3] As a

3. RSMo § 475.050 (1978) did provide that the spouse of a person "may be" appointed guardian

matter of common law, Missouri courts held that relatives should be appointed over strangers unless the record disclosed dissension in the family, adverse interests of relatives and the incompetent, the lack of business ability of the relative, or any other reason why the stranger would best serve the interests of the incompetent. *Roots v. Reid*, 555 S.W.2d 54, 57 (Mo.App., K.C.Dist. 1977). This rule did not grant relatives some kind of unwritten right to impose themselves on the affairs of the incompetent, but recognized that the incompetent, if she could express her intent, would prefer a relative over a stranger. *In the Matter of Weissinger*, 720 S.W.2d 430, 434 (Mo.App., E.D.1986). The rule expressed in *Roots* was, thus, merely an attempt to surmise what the intent of the incompetent person would have been. *Id.*

■ The 1983 revisions of Chapter 475 of the Missouri Statutes, in part, codified the rules set out in *Roots*. See RSMo § 475.050.1(3). However, that subsection is subordinate to the preferences established by RSMo § 475.050.1(1) and (2); *Weissinger*, 720 S.W.2d at 434–35. The sense of this matter of subordination is clear; the court cannot assume that the intent of the incompetent would be to appoint a relative to serve as guardian where there is a clear intent that the ward would want to nominate someone else. The person the ward requests, or whom it could be inferred she would request, should, consequently, be given preference. *In the Matter of Crist*, 732 S.W.2d 587, 590 (Mo.App., E.D.1987).

The appellant contends that the nomination made in the ward's durable power of attorney should be given no weight, and that the power of attorney is void because it is not acknowledged as required by RSMo § 486.575 (1986) and RSMo § 442.360 (1986). We disagree.

■ RSMo § 442.360 (1986) provides that powers of attorney must be acknowledged, "as other instruments in writing conveying or affecting real estate are required to be acknowledged or proved and certified and recorded." RSMo § 486.575 (1986) provides that durable powers of attorney must be recorded and that no power of attorney "shall be accepted for recording unless acknowledged before an officer authorized to administer oaths in the same manner as provided for deeds by the applicable statutes of this state." There is nothing in either section, or in either act, that declares an instrument void if not properly acknowledged. Indeed, since its earliest years of statehood, Missouri courts have held that, with few exceptions, unacknowledged documents are binding on the parties making them. *Logan v. Phillips*, 18 Mo. 22, 24 (1853) (marriage contract); *Klenke v. Koeltze*, 75 Mo. 239, 244–45 (1881) (marriage contract); *Robb v. N.W. Electric Power Cooperative*, 297 S.W.2d 385, 389 (Mo.1957) (deed); *Blackburn v. Spence*, 384 S.W.2d 535, 539 (Mo.1964) (deed); but see *McCoy v. N.W. Electric Power Cooperative*, 297 S.W.2d 390, 391 (Mo.1957) (right of dower).

■ The purpose of acknowledgment is twofold: to protect creditors and subsequent purchasers by providing notice, *Pine Lawn Bank and Trust Company v. Urbahns*, 417 S.W.2d 113, 119 (Mo.App., St.L. Ct.App.1967); and to permit the introduction of the instruments into evidence without further proof of execution. *Cook v. Tide Water Associated Oil Co.*, 281 S.W.2d 415 (Mo.App., Spfld.Ct.App.1955); RSMo § 490.410. The power of attorney here, by not being properly acknowledged, did neither. It was not recordable pursuant to RSMo § 486.570 and provided no notice to third parties.[4] In addition, the durable power of attorney was not admissible into evidence absent evidence of execution—which was presented in the case below.

---

4. We note that under the uniform durable power of attorney law, enacted by the Missouri legislature in 1989, durable powers of attorney need not be recorded to be binding. RSMo § 404.705.3. In addition, those powers of attor-

ney drafted under the prior law need not be recorded to be effective and durable except when regarding conveyances of real estate. RSMo § 404.735.4 (1989).

Notwithstanding these limitations, the power of attorney was still valid between the parties and the nomination made by the ward was also valid for purposes of RSMo § 475.050.2 (1989).[5]

■ Appellant also claims that any preference must be examined under the *Roots* test. We disagree. *Roots* clearly is applicable only where the ward has not made her intent known and where the court is forced to determine who the ward would wish to appoint if capable. It has no application where the intent of the ward is clear.[6]

The appellant next claims that the trial court erred in finding that the ward had the necessary mental capacity to execute the power of attorney. In court tried cases, this court reviews the judgment pursuant to the standard set forth in *Murphy v. Carron*, 536 S.W.2d at 32. Under this standard, we are required to affirm the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32; *In the Matter of Conservatorship Estate of Moehlenpah*, 763 S.W.2d 249, 255 (Mo. App., E.D.1988). Appellate courts exercise the power to set aside the judgment of the trial court on evidentiary grounds with great caution and only where there is a firm belief that the judgment is wrong. *Moehlenpah*, 763 S.W.2d at 255. Weighing the evidence is a function of the trial court, and, in so doing, it may believe all, part, or none of the testimony of any witness. *Id.*

■ Bearing in mind these principles, we find more than sufficient evidence that the ward was competent when she executed the power of attorney. Counselor Althauser testified that he spent several hours with the ward preparing the power of attorney and the modification to the power of attorney. Counselor Althauser testified that he had no question about the ward's ability to understand what she was doing and stated that she was "very forceful about what she wanted." Point denied.

■ Appellants' last contention is that the trial court erred in appointing respondent because she failed to make a proper accounting of the expenditures of the ward's funds and abused her position to obtain modifications in the ward's estate plan and to become a beneficiary of the ward's life insurance policy.

As noted above, RSMo § 475.050.2 requires that "good cause" be shown before the trial court has the authority to appoint someone as guardian other than a qualified person nominated by the ward within the last five years. We review the trial court's decision according to the standards set forth in *Murphy v. Carron*, 536 S.W.2d at 32.

We have reviewed the account kept by respondent and, although it is far from perfect, we do not find its inadequacies sufficient to leave us firmly convinced that the trial court erred. Appellant alleges no fraud or bad faith on the part of respondent, and we do not believe the evidence would be sufficient to support such a claim. Respondent testified that she kept the books in a manner recommended by Mr. Hardesty, but that, understanding that a more detailed accounting is required, she

**5.** The parties have cited no cases similar to the one presented and our research has uncovered none. In *Kountouris v. Varvaris*, 476 So.2d 599 (Miss.1985), however, the Supreme Court of Mississippi considered the validity of a transfer of land made by an attorney in fact operating under an unacknowledged power of attorney. The court there stated that the lack of acknowledgement "benefits only subsequent purchasers ... who have recorded their deeds or subsequent judgment lien creditors who have properly enrolled their judgment." *Kountouris*, 476 So.2d at 604. The court went on to note that

"all that is requisite to the enforceability of the power of attorney is execution and delivery." *Id.* Although these statements were largely dicta, we note that they are consistent with the holding we reach here.

**6.** We note that the evidence demonstrating the ward's desire to have the respondent serve as a guardian is not limited to the nomination contained in the power of attorney. Several witnesses also testified that the ward had expressed to them that she trusted respondent and wanted the respondent to take care of her financial affairs.

would maintain the books in a proper manner.

Appellant next directs this court to payments made to friends of the ward, Lulu Birkel and Harold Scheidegger. The evidence revealed that, every Friday, the ward visited with Miss Birkel. Mr. Scheidegger owned property near the ward and came by to check on her condition and brought her groceries and other necessities from town.

Prior to the respondent acquiring the power of attorney, neither of these two parties received payment for their visits and services. Shortly afterwards, however, the respondent began paying Lulu Birkel for caring for the ward on Fridays and Harold Scheidegger for his services to the ward. Both individuals testified at trial that they probably would have continued to care for the ward in this manner had they not been paid, and that they never threatened to discontinue seeing the ward if they were not paid. These facts do not mean, however, that the respondent's offering to pay and paying the two individuals constituted good cause for the trial court to refuse to appoint the respondent as guardian.

The payments to Miss Birkel never exceeded $25.00 per week, and that amount was paid when Miss Birkel often saw the ward more than once a week. Miss Birkel described the visits as similar to baby-sitting and testified that she had to constantly watch the ward during later visits to ensure that the ward did not wander off. The payments to Mr. Scheidegger never exceeded $30.00 per week. Mr. Scheidegger testified that he took the ward into town and, when she began failing, saw the ward three to four times a week. When the ward got worse, Mr. Scheidegger stopped in every night to check on her. On some days, the ward would call Mr. Scheidegger eight or nine times. While each of the parties testified that they probably would have continued to do these things for the ward without pay, we do not find that the trial court erred in finding that the

respondent's small payments to ensure their continued help and to show appreciation were an abuse of her authority as power of attorney.

Appellant also claims that payments to respondent's daughter-in-law and daughter, as well as payments to respondent herself for services performed, were an abuse of her powers. We disagree.

The record reveals that, as the ward's health failed, the ward required someone in the house with her twenty-four hours a day. Respondent's daughter and daughter-in-law each spent several nights with the ward. Originally, respondent paid each of them forty dollars a day for staying with the ward. Respondent testified that Mr. Hardesty recommended fifty dollars a day and that the payments were increased to that amount. Respondent also testified that she paid herself eight dollars per hour for work done as power of attorney for the ward and testified that several people were paid ten dollars an hour to "deep clean" the ward's house before it was to be auctioned off. We do not find this evidence sufficient to leave us "firmly convinced" that the trial court erred in appointing respondent guardian. The respondent testified that she and the ward discussed the fact that respondent would want payment for acting as the ward's attorney in fact. Counselor Althauser confirmed that such a discussion did, in fact, take place. The respondent consulted with the ward's broker, Mr. Hardesty, made a list of the ward's assets, cared for the ward and arranged for an auction of the ward's home and household goods when the ward was put into a nursing home.[7] As to the other payments, there was no evidence presented at trial that these sums were excessive. Point denied.

As to the fact that the respondent was named in the ward's will and life insurance policy, the record is clear that these changes were made at the ward's insistence. Indeed, Joy Haeffner, who obtained the life insurance policy for the respondent

---

7. The new statutes relating to powers of attorney provide that an attorney in fact is entitled to reasonable compensation and reimbursement for reasonable expenses. See RSMo § 404.725 (1989). The old statutes, RSMo § 486.550 et seq. were silent on this point.

and the ward, testified that the respondent initially objected to being named as a beneficiary but that the ward insisted on her inclusion in the policy. Point denied.

Affirmed.

CRIST and AHRENS, JJ., concur.